SIGNED this 3rd day of November, 2014

_Shelley D. Rucker_

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

In re:

SIAG AERISYN, LLC                                  No. 12-11705
                                                   Chapter 11

            Debtor;

JAMES R. PARIS, Trustee,

            Plaintiff,

v.
                                                   Adversary Proceeding
                                                   No. 13-1040

SSAB ENTERPRISES, LLC,

            Defendant.

### MEMORANDUM

        Defendant SSAB Enterprises, LLC ("SSAB" or "Defendant") has moved for partial

summary judgment in this adversary proceeding regarding whether the amount of $9,901,399

provided to the debtor SIAG Aerisyn, LLC ("SIAG" or "Debtor") by an affiliated company,

1

SIAG Schaaf Industrie AG ("SIAG Schaaf"), constituted a loan that was debt the Debtor owed or

constituted equity that affected the Debtor's solvency for bankruptcy purposes.

     The Debtor, as a debtor in possession, originally filed this adversary proceeding on

March 29, 2013. [Doc. No. 1, Complaint].[1] The court substituted the trustee, James R. Paris

("Plaintiff" or "Trustee"), as the plaintiff by agreed order on August 14, 2013. [Doc. No. 22].

The Complaint asserts that the Debtor made transfers of property to SSAB in the form of

payments within the ninety-day period of the filing of the Debtor's bankruptcy petition. The

Complaint further contends that the payments were made to SSAB as a creditor for or on account

of an antecedent debt and that the payments allowed SSAB to receive more than it would have

received if the case were a Chapter 7 bankruptcy case. The Plaintiff further alleges that the

Debtor was insolvent at the time of the transfer. He seeks to avoid the transfers pursuant to 11

U.S.C. § 547(b). The Plaintiff seeks a judgment in the amount of $2,598,921.90 pursuant to 11

U.S.C. § 550(a).

     It is this last element that is at issue in this motion. Was the Debtor insolvent? A

substantial portion of the Debtor's liabilities were advances from its affiliate. SSAB has filed a

motion for partial summary judgment seeking a judgment from this court that the approximately

$9.9 million in advances from SIAG Schaaf were equity investments and not a loan for solvency

analysis purposes. [Doc. No. 84]. The Trustee opposes the motion. [Doc. No. 91]. The Trustee

argues in part that *even if* this court decides that there is no genuine issue of material fact

regarding whether the $9.9 million in advances were equity contributions rather than loans to the

Debtor, the Debtor was still insolvent as of the dates of the alleged preference payments to

SSAB. The Trustee argues that the Debtor had a contract with REpower Systems AG

---

[1] All docket entry reference numbers refer to docket entries for Adversary Proceeding No. 13-1040, unless otherwise noted.

("REpower") dated December 1, 2011, and that under that contract, REpower advanced SIAG $8.3 million. However, the Debtor only acknowledged $2 million of the $8.3 million owed to REpower in its bankruptcy schedules. Therefore, the Trustee contends that even if the $9.9 million advance from SIAG Schaaf was an equity investment, SIAG was still insolvent due to another $6.3 million in liabilities that were unaccounted for in its bankruptcy schedules.

SSAB has made clear that its motion for partial summary judgment does not address the alleged REpower debt. [Doc. No. 85, Memorandum in Support of Amended and Restated Motion for Partial Summary Judgment, p. 2, n. 2]. Accordingly, the court will address only whether there is a genuine issue of material fact that the funds provided to the Debtor were debt or equity contributions.

## I.    Background

The Debtor was an entity that manufactured and distributed towers used to mount turbines for the generation of electricity through the use of wind energy. *See* [Doc. No. 89-18, Ex. 12, p. 8, SIAG Financial Statements]. SIAG's operating agreement ("Operating Agreement") indicates that SIAG North American Holdings, Inc. and Wind Recovery, LLC were the two members owning all of the membership interests in the Debtor at the time of its formation on July 14, 2009. [Doc. No. 89-17, Ex. 11, p. 1, Operating Agreement]. SIAG North American Holdings, Inc. held 70% of the membership interests and Wind Recovery, LLC held 30% of the membership interests. *Id.* at p. 9. However, the Debtor's 2011 tax return indicates that SIAG North American Holdings, Inc. held a 99% interest with Wind Recovery, LLC holding a 1% interest. [Doc. No. 89-15, Ex. 10, pp. 7-8]; *see also*, London Aff., ¶ 12. Evidence in the record indicates that SIAG Schaaf "through its subsidiary, SIAG North American Holdings, Inc., owns a 70% equity interest in" SIAG. [Doc. No. 89-11, Ex. 7, p. 4, Promissory Note ("Note")].

3

On or around July 29, 2011 the Debtor contracted with SSAB to furnish materials to the

Debtor to construct wind towers. *See* Affidavit of Jack D. London ("London Aff."), ¶ 6. The

contract for the materials required the Debtor to pay SSAB for the goods within 30 days of the

invoice for the goods. London Aff., ¶ 7; [Doc. No. 89-7, Ex. 3, p. 000028]. SSAB began making

shipments to the Debtor on September 8, 2011 through February 8, 2012, and SSAB invoiced the

Debtor for each shipment. London Aff., ¶ 8; [Doc. No. 89-7, Ex. 3, pp. 0000544-562]. During

the 90-day period prior to the Debtor's filing of its bankruptcy petition, the Debtor transferred a

total amount of $2,598,921.90 in payment of the 126 invoices from SSAB. London Aff., ¶ 9;

[Doc. No. 89-9, Ex. 5].

The Debtor filed its Chapter 11 bankruptcy petition on April 2, 2012. [Bankr. Case No.

12-11705, Doc. No. 1]. In its summary of schedules the Debtor listed assets in the amount of

$18,728,994.88 and liabilities in the amount of $24,261,855.36. [Doc. No. 84-2, Ex. A]. The

Complaint asserts that the Debtor made transfers of property in the form of payments made to the

Defendant in the 90 days prior to the Debtor's bankruptcy filing. [Doc. No. 1, Complaint].

Exhibit A attached to the Complaint indicates that dozens of payments were made to SSAB

between January of 2012 and March of 2012 in a total amount of $2,598,921.90. [Doc. No. 1-1,

Exhibit]. The Trustee seeks to avoid the allegedly preferential transfers pursuant to 11 U.S.C. §

547(b).

In the Summary of Schedules the Debtor listed an amount of $16,595,164.67 as liabilities

owed to creditors holding unsecured nonpriority claims. [Doc. No. 84-2, Ex. A, Summary of

Schedules]. On Schedule F the Debtor listed several amounts owed to the affiliated company,

SIAG Schaaf. *See id.*, Ex. A, Schedule F, p. 31. The Debtor listed three claims owed to SIAG

Schaaf: (1) in the amount of $301,354.76 with no description; (2) in the amount of $540,611.00

4

listed as a "Note Payable"; and (3) $9,901,399.00 listed as "Advances from parent". *Id.* In

response to SSAB's discovery requests regarding the nature of the almost $10 million debt, the

Trustee asserted:

> The debt listed in the amount of $9,901,399.00 on Schedule F from the Debtor to
> Schaaf is based upon funds provided by Schaaf to the Debtor for the purchase of
> towers, flanges, internals (ladders, elevators, etc., inside the towers) and steel, in
> furtherance of the production of its products and the payment of operating
> expenses.

[Doc. No. 84-3, Ex. B, Plaintiff's Answers to Defendant's First Set of Interrogatories, Response

to Request for Production of Documents and Response to Request for Admissions ("Trustee

Discovery Responses"), p. 8]. The Trustee Discovery Responses further indicate that

"[p]ayments were made on this debt as funds became available. The interest rate was 5.25%." *Id.*

at p. 9. With respect to why the debt was marked as disputed, the Trustee indicated that he

believed "the debt was marked disputed because there was a disagreement about the amount

and/or appropriateness of certain management fees." *Id.* An exhibit attached to the Trustee's

Discovery Responses demonstrates that the Debtor received funds from SIAG Schaaf in varying

amounts from July 1, 2010 to March 31, 2012. [Doc. No. 84-3, Ex. B, pp. 21-22]. The chart

attached to the discovery responses indicates payments ranging from a low of $50,000 to a high

of $2,500,000. *Id.* In total SIAG Schaaf made 52 payments to SIAG for a total amount of

$11,495,755.39. The chart further indicates that SIAG made two repayments to SIAG Schaaf,

one on March 25, 2011 in the amount of $1,143,040.00 and the second on May 20, 2011 in the

amount of $900,000. *Id.* Thus, the total amount of payments made less the two repayments made

by SIAG is $9,900,500.04. *Id.*

The Plaintiff's expert, Mr. Jack London, a Certified Public Accountant ("CPA"), asserts

in his affidavit filed in support of the Trustee's opposition to SSAB's motion for partial summary

judgment that the Debtor was insolvent during the preference period as its January, February,

and March 2012 balance sheets showed that the Debtor's liabilities exceeded its assets by

approximately $11 million. London Aff., ¶ 10. He further contends that the $9,901,399

transferred by SIAG Schaaf to Debtor is properly characterized as a loan and not an equity

investment due to the existence of a Note, Board Minutes, and Board Consent relating to the

transfer of funds. *Id.* at ¶ 11. He asserts that "[t]he loans were carried on Debtor's books by the

CFOs as debt, and on the Debtor's audited financial statements and tax returns." *Id.* at ¶ 11. Mr.

London explains further:

> It is inappropriate to re-characterize those loans as "equity," as SSAB suggests.
> The loans were always carried on the financial reports as debt. The loans were
> made by SIAG Schaaf pursuant to a promissory note authorized by the Debtor's
> Board of Managers and evidencing "[Debtor's] obligation to repay the Loans."
> SIAG Schaaf was never an owner of the Debtor. At all times, the Debtor was
> owned by SIAG North American Holdings, Inc., a Delaware corporation (99%),
> and Wind Recovery, LLC, a Wisconsin limited liability company (1%). In my 43
> years of experience, I have never seen loans characterized as equity where, as
> here, the lender was never an owner and acquired no interest in the company in
> exchange for the loans.

*Id.* at ¶ 12.  The Note stated that interest would be charged at the "prime rate published by The

Wall Street Journal plus 2% per annum." *Id.* at ¶ 13; [Doc. No. 89-11, pp. 4-5, Note]. Mr.

London opined that "[i]n my 43 years of experience, I have never seen interest charged on equity

investments, except for fixed dividends related to preferred stock. No such stock was issued."

London Aff., ¶ 13. Mr. London notes that the Debtor repaid SIAG Schaaf a total amount of

$2,043,040 and that he has never "seen equity investments repaid unless there was a

corresponding change in ownership interests." *Id.* at ¶ 14.

Mr. London also explained the terms of the demand note:

> The Note was a "demand note." In my 43 years of experience, I have never
> known a demand note to be accompanied by a repayment schedule, nor have I
> seen a company that entered into a demand note to have a sinking fund or to repay

the note except through earnings. The usual reason that a company enters into a demand note evidencing what amounts to an unsecured line of credit is that it needs cash to operate and, therefore, cannot meet a repayment schedule or create a sinking fund, and is expected to pay back the loans through earnings. Loans made pursuant to demand notes do not constitute equity investments where no ownership interest is given in exchange.

London Aff., ¶ 15.

The Plaintiff has provided the court a copy of the Note in its opposition to SSAB's motion for summary judgment. [Doc. No. 89-11, Ex. 7, pp. 4-5]. The Note is signed on October 10, 2010 with an effective date of June 28, 2010. The Note provides that SIAG Schaaf, "through its subsidiary SIAG North American Holdings, Inc., owns a 70% equity interest in" the Debtor. *Id.* The Note further states that SIAG "may from time to time request loan advances ("Loans") from [SIAG Schaaf] on an unsecured basis to fund Borrower's costs of operations, and [SIAG Schaaf] may in its sole discretion advance funds to [Debtor] in response to such requests." *Id.* at ¶ B. Mr. Randy Williams, SIAG's Chief Financial Officer ("CFO") at the time, signed the Note on behalf of the Debtor.

The Plaintiff has further provided the court with a copy of the minutes of the quarterly meeting of the Debtor held on October 18, 2010. [Doc. No. 89-11, Ex. 7, pp. 6-10]. Under the section entitled "Liquidity," the minutes state, "[t]he proposal by SIAG Schaaf Industrie to lend working capital to the [Debtor] to fund operations was approved in the form presented in the resolutions and attached loan agreement and a Unanimous Written Consent to Action was signed by all the Board members authorizing the loan facility." *Id.* at p. 8. The Unanimous Written Consent of the Board of Managers to Corporate Action in Lieu of Annual Meeting ("Written Consent") states in part:

> WHEREAS, the Board has determined that it is in the best interests of the Company to borrow from [SIAG Schaaf], to the extent [SIAG Schaaf] may agree to such borrowing, amounts from time to time, on an unsecured basis, to fund

operations (the "Loans").

NOW, THEREFORE, BE IT RESOLVED, that the Loans be, and hereby are, approved, and the Company is hereby authorized to enter into a Promissory Note evidencing the Loans, substantially in the form attached as Exhibit A ("Promissory Note").

FURTHER RESOLVED, that the officers of the Company be, and each hereby is, authorized and directed to execute and deliver the Promissory Note and to execute and deliver such other instruments and take such other action as may be necessary or appropriate to give effect to the preceding resolution.

[Doc. No. 89-11, Ex. 7, p. 3]. The Written Consent was signed by the five members of the Board of Managers of the Debtor on October 18, 2010. *Id.*

The Trustee has attached copies of the Debtor's General Ledger dating from August 24, 2009 to December 31, 2012. [Doc. No. 89-13, Ex. 9]. The General Ledger indicates multiple notations for "interest expenses" relating to "accrued interest on SIAG note" or "interest expense to accrue interest on SIAG advance." *Id.* Mr. Williams admitted in his deposition that he had never seen interest being charged on a capital contribution, but that interest was being charged monthly on the SIAG Schaaf advances based on notations made in the General Ledger. [Doc. No. 89-22, Ex. 2, Deposition of Randy Williams ("Williams Dep."), p. 32].

The Trustee has also included a copy of an independent auditor's report and financial statements as of December 31, 2009 as one of the exhibits to Mr. London's affidavit. [Doc. No. 89-18, Ex. 12]. The financial statements from the Debtor's period of inception of August 24, 2009 to December 31, 2009 indicate that the Debtor had a net income of $2,162,555. *Id.* at p. 5.

SSAB has provided the declaration of Randy Williams dated January 10, 2014 in support of its motion for partial summary judgment. [Doc. No. 84-4, Ex. C, Declaration of Randy Williams ("Williams Decl.")]. Mr. Williams asserts that, as SIAG's former Vice President and Chief Financial Officer, during his tenure

. . . SIAG lost money almost every month and rarely generated enough income to fund its capital and operating expenses. As the result, SIAG's parent company in Germany, SIAG Schaaf . . . regularly advanced the funds necessary to operate SIAG's business. Typically, SIAG would inform SIAG Schaaf of its anticipated funding needs and, after SIAG Schaaf satisfied itself those anticipated funding needs were reasonable and necessary, SIAG Schaaf would wire the funds to SIAG's account in the United States.

SIAG Schaaf started to make such advances to SIAG on July 1, 2010. At the time, to my knowledge there was no documentation signed by SIAG or otherwise created which evidenced an obligation on the part of SIAG to repay the advances made by SIAG Schaaf.

October 18, 2010 I was asked to attend in Des Plaines, Illinois a meeting of the board of managers of SIAG. At the time, SIAG Schaaf already had advanced nearly $1.4 million to SIAG. During the meeting one of the SIAG man[a]gers or SIAG's counsel, Charles Banino, handed me, and instructed me to sign on behalf of SIAG, a back-dated Promissory Note "effective as of June 28, 2010" which purported to require SIAG to repay "on demand" the "advances" made by SIAG Schaaf.

Despite signing the Promissory Note, I did not consider the advances to be a bona-fide debt on the part of SIAG. I also did not receive a copy of the Promissory Note which is why I did not recall, including when I signed an earlier Declaration in this case, signing the Promissory Note until the Trustee produced a copy just before my June 26, 2014 deposition in this case.

To my knowledge, SIAG Schaaf never established, and the parties never otherwise agreed on, a fixed maturity date or a repayment schedule for the advances made by to [sic] SIAG. Rather, the understanding between the parties was that SIAG would make repayments from time to time but only if and when its cash receipts from sales so permitted and only after SIAG had paid its vendors.

During my tenure as Vice President and CFO, SIAG was able to make repayments to SIAG Schaaf on only two occasions, $1,143,040 in March, and $900,000 in May, 2011. To my knowledge, SIAG never made any other principal or interest payments to SIAG Schaaf on account of the advances.

To my knowledge, all the advances by SIAG Schaaf to SIAG were unsecured and SIAG Schaaf had no ability to recoup the advances other than through whatever income SIAG generated from sales to its customers. SIAG did not, and could not, establish a sinking fund from which to make repayments to SIAG Schaaf.

During my tenure as Vice President and CFO, SIAG had no practical funding alternatives to the advances made by SIAG Schaaf since, based on its significant and recurring monthly losses, there was no realistic prospect that a bank or other

commercial lending institution would loan money to SIAG.

During my tenure as Vice President and CFO, I considered SIAG to be substantially undercapitalized and the advances made by SIAG Schaaf were necessary to operate the business. Without those advances, SIAG would not have been able to pay its ongoing expenses and would have ceased to operate.

Williams Decl., ¶¶ 3-11. However, in Mr. Williams' deposition he admitted that he was unaware of any company records that characterized the $9.9 million transfer as anything other than a loan. Williams Dep., pp. 17-18. Mr. Williams further admitted in his deposition that he treated the advances from SIAG Schaaf as liabilities on the Debtor's balance sheets for July and September of 2010. *Id.* at p. 22-23. *See also,* [Doc. No. 89-10, Ex. 6, SIAG's Balance Sheets]. He also acknowledged that in looking at a balance sheet prepared just prior to his departure from the Debtor that the Debtor was insolvent at the time the Debtor left the company. Williams Dep., p. 27. He also assumed that the tax returns would also reflect the advances from SIAG Schaaf as debt. *Id.* at 29.

Mr. Bobby Callahan, the former CFO of SIAG following the departure of Mr. Williams in November 2011, testified in his deposition that the $9.9 million provided by SIAG Schaaf to SIAG was "not a note. It was an advance." [Doc. No. 84-5, Ex. D, p. 7]. He further testified that he was unaware of any note signed relating to the $9.9 million provided by SIAG Schaaf to SIAG. *Id.* He agreed that the amount owed to SIAG Schaaf was not able to be paid while he was at SIAG. *Id.* at p. 10. However, in the "Errata" to the deposition, Mr. Callahan corrected his testimony regarding whether the $9.9 million paid to SIAG was an advance and responded, "No" to the question of whether he knew "why the same notation note payable was not made with respect to the $9.9 million dollars. *Id.* at p. 12. Mr. Callahan also corrected much of his testimony regarding whether the $9.9 million from SIAG Schaaf was a loan or an advance and whether a note existed. *Id.* at pp. 12-13.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding.  The Plaintiff's action regarding determining, avoiding or recovering preferences is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(F).

## III.    Standard of Review

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Kava v. Peters*, No. 09-2327, 2011 WL 6091350, at *3 (6th Cir. Dec. 7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving

11

party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th

Cir. 1996).

###    IV.    Analysis

11 U.S.C. § 547(b) provides in relevant part:

> the trustee may avoid any transfer of an interest of the debtor in
> property—
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such
> transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made—
>>> (A) on or within 90 days before the date of the filing of the
>>> petition; or
>>> (B) between ninety days and one year before the date of the filing
>>> of the petition, if such creditor at the time of such transfer was an
>>> insider; and
>> (5) that enables such creditor to receive more than such creditor would
> receive if—
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent
>>> provided by the provisions of this title.

11 U.S.C. § 547(b).

The Defendant argues that Section 547(b) does not apply because the Debtor did not

make the payments to it while it was "insolvent." It relies on the Sixth Circuit decision in *Bayer*

*Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)* in support of its contention that the

approximately $10 million dollars provided to the Debtor by an affiliated company should be

classified as equity and not debt. 269 F.3d 726 (6th Cir. 2001).  One of the main issues addressed

by the Sixth Circuit in that case was whether certain alleged debt should be recharacterized as

equity. *Id.*at 747-748. The Court noted that "[r]echaracterization is appropriate where the

circumstances show that a debt transaction was 'actually [an] equity contribution [ ] *ab initio*.'"

*Id.* at 747-748 (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997))

12

(emphasis in original). The Sixth Circuit held "that a bankruptcy court can consider whether to recharacterize a claim of debt as equity. Bankruptcy courts that have applied a recharacterization analysis have stated that their power to do so stems from the authority vested in the bankruptcy courts to use their equitable powers to test the validity of debts." 269 F.3d at 748.

In *In re Autostyle Plastics* the Sixth Circuit developed an eleven part test for determining whether a court should recharacterize debt to equity based on factors developed by an earlier Sixth Circuit case, *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986).

> The factors are: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Id.* at 749.

The Sixth Circuit further explained that "[n]o one factor is controlling or decisive. The factors must be considered within the particular circumstances of each case. We note that '[t]he more [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt.'" *In re AutoStyle Plastics*, 269 F.3d at 750 (quoting *In re Cold Harbor*, 204 B.R. at 915). In fact, the analyses of all of these factors "devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006). In *In re SubMicron Systems* the Third Circuit emphasized that:

13

No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. While some cases are easy (*e.g.,* a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

*Id.* The test is "a highly fact-dependent inquiry that will vary in application from case to case." *Fairchild Dornier GMBH v. Official Committee of Unsecured Creditors (In re Official Committee of Unsecured Creditors for Dornier Aviation)*, 453 F.3d 225, 234 (4th Cir. 2006).

The court will examine each of the AutoStyle factors with respect to the $9.9 million provided to SIAG by its parent company.

### 1.    The Names Given to Instruments Evidencing the Indebtedness

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *In re AutoStyle Plastics*, 269 F.3d at 750. The Trustee has provided a copy of the Note evidencing the advancement of funds to the Debtor. There were also corporate meeting minutes evidencing the loan, as well as the Written Consent signed by the Debtor's Board of Managers discussing the loan. [Doc. No. 89-11, Ex. 7]. The Note post-dates the first advancement of funds to the Debtor by a few months, but the Note was signed, and the Board Meeting occurred on October 18, 2010. *Id.* The Debtor did not file its petition until April 2, 2012. [Bankr. Case No. 12-11705, Doc. No. 1]. Thus, the Note pre-dated the bankruptcy filing by around eighteen months.

In addition, there are other accounting documents, such as the General Ledger, that

indicate that the Debtor counted the advances as liabilities rather than assets. *See* [Doc. No. 89-13].

SSAB contends that the failure to create the Note prior to SIAG Schaaf's initial advances, the failure to provide either Mr. Williams or Mr. Callahan with a copy of the Note, and the failure to characterize the Note as a promissory note, rather than an advance in the Debtor's Schedule F indicates that the Note was not a Note, but was intended to be an equity investment. SSAB also points to the fact that SIAG Schaaf never filed a proof of claim as evidence that the Note was not intended to be a Note. The court concludes that while these facts may create doubt regarding whether the Note was truly a Note, because of the existence of the Note itself and other indicia of an intent to create a debt, the court must find that there are issues of fact regarding whether the advances were intended to be a debt. Therefore, this factor weighs in favor of denying SSAB's motion for partial summary judgment.

### 2.     The Presence or Absence of a Fixed Maturity Date and Schedule of Payments

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *In re AutoStyle Plastics*, 269 F.3d at 750. As explained by Mr. London in his affidavit, the Note was a demand note, and it did not have a fixed maturity date. London Aff., ¶ 15. As a demand note, it appears that the Note would not typically have a repayment schedule. *See id.* This factor weighs in favor of the advances being an equity investment. However, the court concludes that issues of fact remain regarding the intent of the parties due to the nature of the alleged loan being subject to a demand note, which would not typically have a fixed maturity date.

### 3.     The Presence or Absence of a Fixed Rate of Interest and Interest Payments

"The absence of a fixed rate of interest and interest payments is a strong indication that

the advances were capital contributions rather than loans." *In re AutoStyle Plastics*, 269 F.3d at

750. The Note includes a provision for interest, indicating that the interest is "equal to the prime

rate published by The Wall Street Journal plus two percent (2%) per annum." [Doc. No. 89-11,

Ex. 7, Note]. The General Ledger indicates monthly interest accruals relating to the advances

from SIAG Schaaf. [Doc. No. 89-13]. SSAB notes that the Debtor never made any interest

payments, but the court concludes that there is evidence of the presence of an interest rate and

calculation of interest. Therefore, the court concludes that analysis of this factor weighs in favor

of denying the motion for partial summary judgment.

### 4.      The Source of Repayments

"If the expectation of repayment depends solely on the success of the borrower's

business, the transaction has the appearance of a capital contribution." *In re AutoStyle Plastics*,

269 F.3d at 751. In one of the earliest Circuit Court cases discussing the differences between a

capital contribution and debt, the Eleventh Circuit noted that "[i]n order for an advance of funds

to be considered a debt rather than equity, the courts have stressed that a reasonable expectation

of repayment must exist which does not depend solely on the success of the borrower's

business." *Lane v. United States (In re Lane)*, 742 F.2d 1311, 1314 (11th Cir. 1984).

In this case the evidence demonstrates that the Debtor made two significant repayments

on the advance: one on March 25, 2011 in the amount of $1,143,040 and one on May 20, 2011 in

the amount of $900,000. [Doc. No. 84-3]. As explained by Mr. London, the Note was a demand

note, and therefore, there was no repayment schedule. London Aff., ¶ 15. Mr. Williams claims

that "the understanding between the parties was that SIAG would make repayments from time to

time but only if and when its cash receipts from sales so permitted and only after SIAG had paid

its vendors." Williams Decl., ¶ 7. However, it appears that at most, the evidence regarding this

factor is mixed, creating genuine issues of material fact regarding whether the advances were

debt or equity. Therefore, this factor weighs against granting the motion for partial summary

judgment.

### 5.      The Adequacy or Inadequacy of Capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital

contributions rather than loans." *In re AutoStyle Plastics*, 269 F.3d at 751 (citing *Roth Steel*, 800

F.2d at 630). In his declaration Mr. Williams stated that "[d]uring my tenure as Vice President

and CFO, I considered SIAG to be substantially undercapitalized and the advances made by

SIAG Schaaf were necessary to operate the business." However, there is also evidence through

the Operating Agreement that SIAG Holdings North America, Inc. had provided the Debtor with

an initial investment of $5 million dollars upon its inception. [Doc. No. 89-17, Operating

Agreement, p. 29]. Further evidence exists that the Debtor had a net income of $2,162,555

during the first few months of its operation. *See* [Doc. No. 89-18, Financial Statement for period

from August 24, 2009 to December 31, 2009, p. 5]. *See also*, London Aff., ¶ 16. Based on this

conflicting evidence, it appears that genuine issues of material fact exist regarding whether SIAG

was inadequately capitalized at its inception. This factor thus weighs in favor of denying SSAB's

motion for partial summary judgment.

### 6.      The Identity of Interest Between the Creditor and the Stockholder

"If stockholders make advances in proportion to their respective stock ownership, an

equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a

stockholder's percentage interest in stock and debt is indicative of bona fide debt." *In re

AutoStyle Plastics*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630).

In this case it appears there is evidence through the Operating Agreement and through

Mr. London's affidavit testimony that SIAG Schaaf was not an owner of the Debtor. *See* London

Aff., ¶ 12; [Doc. No. 89-17, Ex. 11, Operating Agreement]. Mr. London testified that "[l]oans

made pursuant to demand notes do not constitute equity investments where no ownership interest

is given in exchange." London Aff., ¶ 15. However, the Note indicates that SIAG Schaaf is

related to the Debtor. The preamble of the Note states that SIAG Schaaf has a controlling interest

and "through its subsidiary, SIAG North American Holdings, Inc., owns a 70% equity interest"

in SIAG. [Doc. No. 89-11, p. 4, Note]. It is unclear from the evidence provided whether SIAG

Schaaf's advances to SIAG were in proportion to its equity interest in the Debtor. This factor

again appears to weigh in favor of denying SSAB's motion for partial summary judgment due to

the unclear nature of the evidence.

### 7.       The Security, If Any, for the Advances

"The absence of a security for an advance is a strong indication that the advances were

capital contributions rather than loans." *In re AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth*

*Steel*, 800 F.2d at 631). It appears from the evidence in the Note that the advance was unsecured.

*See* [Doc. No. 89-11, Ex. 7, Note, p. 4]. As Mr. London explained, "[t]he usual reason that a

company enters into a demand note evidencing what amounts to an unsecured line of credit is

that it needs cash to operate and, therefore, cannot meet a repayment schedule or create a sinking

fund, and is expected to pay back the loans through earnings." London Aff., ¶ 15. This factor

therefore weighs in favor of characterizing the advance as equity.

### 8.       The Corporation's Ability to Obtain Financing from Outside Lending
###          Institutions

"When there is no evidence of other outside financing, the fact that no reasonable creditor

would have acted in the same manner is strong evidence that the advances were capital

contributions rather than loans." *In re AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800

F.2d at 631). There is evidence in this case that it would have been difficult for SIAG to find funding from a bank or other commercial institution. *See* Williams Decl., ¶ 10; Callahan Dep., p. 10. The Trustee has not presented evidence regarding whether SIAG attempted to obtain traditional funding from other sources. SIAG Schaaf is an affiliated entity with the Debtor due to its significant equity ownership interest in Debtor through its subsidiary SIAG North American Holdings, Inc. *See* [Doc. No. 89-11, p. 4, Note]. This factor, therefore, weighs in favor of determining the advance was an equity investment. However, in a situation where an affiliated company is struggling, it may be that other related companies are the only entities willing to loan the company money. As the Fourth Circuit has noted, "a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans." *Fairchild Dornier GMBH*, 453 F.3d at 234. The court concludes that this factor is not dispositive of the equity versus debt issue as it may have been difficult for the Debtor to access traditional lending when it was beginning to falter financially. Therefore, the court concludes that the absence of traditional lending does not preclude the finding that the nearly $10 million in advances was a loan rather than an equity investment.

### 9.     The Extent to Which the Advances Were Subordinated to the Claims of Outside Creditors

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *In re AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631-32). It is unclear whether the claims of SIAG Schaaf for the advances were subordinated to other creditors. At the time SIAG Schaaf made the advances to Debtor, it appears that the Debtor was struggling to pay any of its creditors and keep its operations running.

19

Mr. Williams testified that "the understanding between the parties was that SIAG would make repayments from time to time but only if and when its cash receipts from sales so permitted and only after SIAG had paid its vendors." Williams Decl., ¶ 7. However, there is evidence that SIAG made two repayments on the advance made by SIAG Schaaf. Due to a lack of evidence regarding SIAG's payments to other creditors, this factor weighs in neither parties' favor. Issues of fact remain regarding the extent to which the advances at issue were subordinated to other claims.

### 10.    The Extent to Which the Advances Were Used to Acquire Capital Assets

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *In re AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 632). Mr. Williams testified in his declaration that "the advances made by SIAG Schaaf were necessary to operate the business." Williams Decl., ¶ 11. From the evidence provided in the record, it appears that SIAG needed the advances from SIAG Schaaf to keep funding the daily operations of the business. Therefore, this factor weighs in favor of finding the advances to be debt rather than equity.

### 11.    The Presence or Absence of a Sinking Fund to Provide Repayments

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *In re AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 632). There does not appear to have been a sinking fund for repayment. Mr. London testified in his affidavit that in his experience "I have never known a demand note to be accompanied by a repayment schedule, nor have I seen a company that entered into a demand note to have a sinking fund or to repay the note except through earnings. The usual reason that a company enters into a demand note evidencing what amounts to an unsecured line of credit is

that it needs cash to operate and, therefore, cannot meet a repayment schedule or create a sinking fund, and is expected to pay back the loans through earnings." London Aff., ¶ 15. This factor appears to be neutral based on the fact that the Note was a demand note.

The court has reviewed the *AutoStyle Plastics* factors and has concluded that most of the factors weigh in favor of denying SSAB's motion for partial summary judgment due to genuine issues of material fact remaining regarding whether the parties intended the advances to be a loan or an equity investment. The presence of a Note, Board Meeting minutes, the Written Consent, interest amounts in the General Ledger, classification of the advances as liabilities rather than assets all raise issues of fact regarding whether the advances were intended to be a loan. Accordingly, the court concludes that it will deny SSAB's motion for partial summary judgment.

### IV.    Conclusion

As explained *supra*, the court concludes that genuine issues of material fact remain regarding whether the approximately $9.9 million in advances provided by SIAG Schaaf to the Debtor constituted loans or equity investments for purposes of the insolvency analysis relating to the Trustee's preference claim pursuant to 11 U.S.C. § 547(b). Therefore, SSAB's motion for partial summary judgment will be DENIED.

A separate order will enter.

# # #